### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** _____ |
| v. | : | **DATE FILED:** _____ |
| **KVK-TECH, INC.**<br>**KVK RESEARCH** | :<br>: | **VIOLATION:**<br>21 U.S.C. §§ 331(a) and 333(a)(1)<br>(adulterated drugs- 2 counts)<br>**Notice of forfeiture** |

### INFORMATION

### COUNTS ONE AND TWO

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

1. Defendant KVK-TECH, INC. ("KVK"), located in Newtown, Pennsylvania, manufactured, processed, packed, labeled, held, and distributed generic drugs. Defendant KVK operated and existed under the laws of the Commonwealth of Pennsylvania. Defendant KVK, formed on or about June 5, 2003, was incorporated as a privately held corporation. KVK was owned by three trusts.

2. Defendant KVK Research ("RESEARCH") was an affiliate of defendant KVK used to communicate with vendors and regulators. Defendant RESEARCH was formed on or about February 19, 2010 and was owned by the same three trusts that owned defendant KVK.

### The Federal Food, Drug and Cosmetic Act

3. The United States Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*. FDA's responsibilities included ensuring that drugs intended for use in humans were safe and effective for their intended uses and that the labeling of such

drugs was true and accurate. Pursuant to such responsibility, FDA promulgated and enforced regulations for the approval, manufacture, and distribution of drugs.

4. All new drugs distributed in the United States were required to be approved by the FDA. Prescription drugs had significant, sometimes lifesaving, positive effects, but they also could present significant risks. FDA approved a new drug only after review of extensive testing showing that a drug provided the benefits described in its labeling, and that those benefits outweighed its risks.

5. The FDCA defined *drugs* as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man, and articles (other than food) intended to affect the structure or any function of the body of man. 21 U.S.C. § 321 (g)(1)(B) and (C). The Code of Federal Regulations ("CFR") Section 314.3(b) further defined a *drug product* as a finished dosage form, e.g., tablet, capsule, or solution, that contained a drug substance, generally, but not necessarily, in association with one or more other ingredients; and a *drug substance* as an active pharmaceutical ingredient ("API") that was intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or any function of the human body.

6. A new drug application ("NDA") was a comprehensive document that a drug manufacturer was required to submit to FDA to request approval to distribute a new drug in the United States. A drug for which an NDA was submitted would have already passed through several clinical trials to establish the drug's safety and efficacy.

7. Generic drugs were essentially copies of a brand-name drug for which an NDA was approved. Generic drug manufacturers may submit to FDA an abbreviated new drug application ("ANDA") which contained data for the review and potential approval of a generic drug product. Unlike an NDA, an ANDA did not require human clinical trials to prove safety and efficacy. Once approved, an

applicant could manufacture and market the generic drug product to provide a safe, effective, lower cost alternative to the brand-name drug it references.

8. A generic drug was required to be "pharmaceutically equivalent" to the brand drug in dosage form, strength, route of administration, quality, performance characteristics, and intended use. The API in a generic version of a drug also must have been the same as that of the brand.

9. The FDCA prohibited causing the introduction or delivery for introduction into interstate commerce of any drug that was adulterated or misbranded. 21 U.S.C. § 331(a).

10. A drug was deemed adulterated within the meaning of the FDCA, 21 U.S.C. § 351(a)(2)(B), if the methods used in, or the facilities and controls used for, the manufacture, processing, packing, or holding of drugs and components were not in conformance with Current Good Manufacturing Practice ("cGMP") requirements for drugs. 21 C.F.R. Parts 210 and 211.

11. Drugs not manufactured, processed, packed, or held in conformance with cGMP requirements were deemed adulterated as a matter of federal law, without any showing of actual defect.

12. Regulations promulgated pursuant to the FDCA defined cGMP for drugs. 21 C.F.R. § 211.100(a) stated: "There shall be written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." The written procedures to ensure cGMP were referred to as Standard Operating Procedures ("SOPs"). The regulations further required that "the responsibilities and procedures applicable to the quality control unit shall be in writing; such written procedures shall be followed," *id.* at § 211.22(d), and that "appropriate controls shall be exercised over computer or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel," *id.* at § 211.68(b).

## Failures to Adhere to cGMP

13. On or about June 21, 2006, defendant KVK filed ANDAs seeking FDA approval to market the generic drug hydroxyzine in various dosage strengths. In these ANDAs, defendant KVK stated that the drugs would be produced with API manufactured by Supplier 1, known to the United States Attorney, at its facility located in Braine-l'Alleud, Belgium. On or about March 20, 2007, FDA approved defendant KVK's ANDAs. Around the same time as FDA's approval of the ANDAs, Supplier 1 ceased production of API at its Belgium facility.

14. On or about May 31, 2008, defendant KVK notified FDA that it intended to obtain API for its hydroxyzine tablets from Supplier 2, known to the United States Attorney, manufactured at its plant located in Italy, which was not specified in the FDA-approved ANDAs. Because this change was considered a major change under FDA regulations (21 C.F.R. § 314.70), FDA required KVK to file a "prior approval supplement" ("PAS") and obtain FDA's approval prior to distributing hydroxyzine tablets made with API not approved in the ANDAs. On or about December 3, 2008, FDA approved defendant KVK's PAS for hydroxyzine, permitting defendant KVK to distribute hydroxyzine tablets containing API manufactured by Supplier 2 at its Italian facility, in addition to hydroxyzine with API manufactured by Supplier 1 in Belgium.

15. Defendant KVK's SOPs for *Raw Material Manufacturer/Vendor Qualification* (QA 023.0, 023.01, and 023.02, effective April 5, 2005, August 23, 2010, and December 30, 2013, respectively) set the criteria to qualify a new API supplier in accordance with cGMP. As part of defendants KVK and RESEARCH's qualification process, an API supplier was required to submit an

extensive survey including, among other things, detailed information on the supplier's organizational structure, quality systems, and SOPs. The SOP further required defendants KVK and RESEARCH to obtain the supplier's last two FDA inspection reports with detailed findings and the supplier's responses and reports of any other regulatory inspections performed within the previous three-year period. According to the SOP, an onsite audit at the supplier's facility may be necessary based on the adequacy of survey responses.

16. Supplier 3, known to the United States Attorney, was a pharmaceutical company with a manufacturing facility located in Morales, Mexico. Between on or about November 6, 2010, through about November 11, 2010, FDA conducted an inspection of Supplier 3's Mexico facility. Following that inspection, FDA issued a Warning Letter to Supplier 3 that API manufactured in its Mexico facility was adulterated, and on or about July 7, 2011, FDA issued an import alert for API manufactured by Supplier 3 at its Mexico facility. This alert authorized any API manufactured by Supplier 3 in Mexico and imported into the United States after that date to be detained. The alert remained in effect until on or about July 12, 2012.

17. On or about October 29, 2010, defendant RESEARCH purchased a commercial quantity of hydroxyzine API from Supplier 1 that was manufactured by Supplier 3 in its facility in Mexico for use in defendant KVK's hydroxyzine tablets. When defendant KVK submitted its ANDAs for hydroxyzine tablets to FDA, it had not listed Supplier 3's facility as a manufacturing site. Supplier 1's first shipment of Supplier 3's API was accepted by defendant RESEARCH on or about January 4, 2011. Defendant KVK failed to notify FDA or take any steps to submit supplemental filings to their approved applications to use the Supplier 3 API before accepting the first shipment.

18. In or about January, March, and May of 2011, defendants KVK and RESEARCH received additional shipments of hydroxyzine API manufactured at Supplier 3's Mexico facility and

used it to manufacture defendant KVK's hydroxyzine tablets for distribution in the United States.

19. Between in or about January 2011 and in or about October 2013, defendant KVK introduced, and caused to be introduced into interstate commerce at least one lot of 10mg hydroxyzine tablets, 34 lots of 25mg hydroxyzine tablets, and 27 lots of 50mg hydroxyzine tablets that were manufactured using API manufactured at Supplier 3's facility in Mexico without notifying or seeking approval from FDA to change the manufacturing facility of the raw material API from those contained within the FDA-approved ANDAs. FDA's cGMP regulations required drug manufacturers such as defendant KVK to adequately control manufacturing operations to control risks to public health. Those regulations, located at 21 C.F.R. part 211, required that defendant KVK maintain a quality control unit whose responsibilities and procedures were required to be in writing and which procedures were required to be followed. 21 C.F.R. § 211.22.

20. Between in or about January 2011 and in or about October 2013, defendants KVK and RESEARCH failed to have sufficient quality control procedures in writing to ensure the rejection of raw material and API that was not manufactured at a facility identified in the FDA-approved ANDAs. These failures were violations of the cGMP regulations located at 21 C.F.R. § 211.22(d).

21. As a result, because the methods used in, and the facilities and controls used for, their manufacture did not conform to the cGMP regulations, the hydroxyzine tablets manufactured by defendant KVK with API from Supplier 3, purchased by defendant RESEARCH, were deemed to be adulterated as a matter of law pursuant to section 351(a)(2)(B) of Title 21, United States Code.

### Data Security

22. Between on or about April 9, 2019, and on or about April 16, 2019, FDA conducted an inspection of defendant KVK's manufacturing facility. During that inspection, FDA found

that defendants KVK and RESEARCH failed to comply with requirements of the FDCA and its associated regulations and it issued a Warning Letter, dated February 11, 2020, describing defendant KVK's violations. For example, FDA found that defendants KVK and RESEARCH failed to exercise appropriate controls over computer and related systems to assure that only authorized personnel institute changes in master production and control records as required by the cGMP regulations.

23. Specifically, data generated from defendant KVK's laboratory testing systems were not adequately protected from deletion or alteration. Defendant RESEARCH was included in the establishment of defendant KVK's security protocols. Four quality assurance employees—three from defendant KVK and one from defendant RESEARCH—had unauthorized administrator access privileges to defendant KVK's chromatographic testing software, which was used for high-performance liquid chromatography assays and impurity analyses of finished drug products. Additionally, it was possible for defendant KVK's drug manufacturing data files to be modified or overwritten without being captured on audit trails on defendant KVK's laboratory equipment.

24. The cGMP regulations promulgated under the FDCA required that appropriate controls be exercised over computer and related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel. 21 C.F.R. § 211.68(b).

25. As a result, because the methods used in, and the facilities and controls used for, their manufacture did not conform to the cGMP regulations, the drug products distributed by defendant KVK with these insufficient controls were deemed to be adulterated as a matter of law pursuant to section 351(a)(2)(B) of Title 21, United States Code.

26. As a result, beginning on or about February 27, 2019, and continuing through on or about April 16, 2019, defendants KVK and RESEARCH shipped to customers, and thereby introduced and delivered for introduction into interstate commerce, and caused to be introduced and

Case 2:24-cr-00069-HB   Document 1   Filed 02/26/24   Page 8 of 10

delivered for introduction into interstate commerce, drugs that were adulterated.

27. On or about each of the dates listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**KVK TECH, INC. and
KVK RESEARCH**

delivered, and caused to be delivered, for introduction into interstate commerce certain lots of drugs within the meaning of the FDCA, 21 U.S.C. § 321(g), which were deemed adulterated as a matter of federal law within the meaning of 21 U.S.C. § 351(a)(2)(B), in that such drugs, identified below, were not manufactured, processed, packed, and held in conformance with cGMP, each delivery constituting a separate count:

| Count | Approximate Date | Drug(s) |
| --- | --- | --- |
| 1 | January 29, 2013 | hydroxyzine 25 mg -500s (DC# 10702-0011-50) |
| 2 | February 8, 2019 | sodium polystyrene sulfonate 15 mg (Batch 15376) |

All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1).

8

## NOTICE OF FORFEITURE

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1. As a result of the violations of Title 21, United States Code, Sections 331(a) and 333(a)(1), set forth in this information, defendant

### KVK RESEARCH

shall forfeit to the United States of America any quantities of hydroxyzine and sodium polystyrene sulfonate which were deemed adulterated as a matter of federal law in the United States when delivered for introduction into interstate commerce, in violation of such offenses.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, that is $1,000,000.

All pursuant to Title 21, United States Code, Section 334, and Title 28, United States Code, Section 2461(c).

*Jacqueline Romero*
JACQUELINE C. ROMERO
UNITED STATES ATTORNEY

*No.*_ _ _ _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

<u>Criminal Division</u>

THE UNITED STATES OF AMERICA

vs.

KVK-TECH, INC.,
KVK RESEARCH

INFORMATION

21 U.S.C. §§ 331(a) and 333(a)(1) (adulterated drugs – 2 counts)

A true bill.

_____
Foreman

Filed in open court this _____day,
Of _____A.D. 20_____
_____
Foreman

Bail, $_____